# Syllabus

Chief Justice:
Robert P. Young, Jr.

Justices:
Michael F. Cavanagh
Stephen J. Markman
Mary Beth Kelly
Brian K. Zahra
Bridget M. McCormack
David F. Viviano

This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.

Reporter of Decisions:
Corbin R. Davis

HENRY v LABORERS' LOCAL 1191
RAMSEY v LABORERS' LOCAL 1191

Docket Nos. 145631 and 145632. Argued October 8, 2013 (Calendar No. 2). Decided May 5, 2014.

Anthony Henry and Keith White brought an action in the Wayne Circuit Court against Laborers' Local 1191 (a labor union that represents construction workers), Michael Aaron (the union's business manager), and Bruce Ruedisueli (the union's president), alleging that their indefinite layoff from employment at the union was unlawful retaliation under the Whistleblowers' Protection Act (WPA), MCL 15.361 *et seq.* Henry and White had worked as business agents for the union until their terminations. They alleged that defendants asked several union members to repair the façade of the Trade Union Leadership Council building. The union recorded payments for the work as picket duty even though the members did not engage in picket duty on those days. Henry and White believed that Aaron was involved in criminal activity, including fraud, an illegal kickback scheme, and misappropriation of union funds. They also believed that the union had required members to work without proper safety precautions and without receiving union wages. Henry circulated an unsigned open letter to the union's leadership and distributed it to the union's membership, the union's parent leadership, and local news outlets. The letter asked why the union was paying members out of its picket fund to work on a for-profit establishment and suggested that Aaron had received illegal kickbacks from the council in exchange for providing the council free construction labor. Henry and White subsequently contacted the United States Department of Labor with their suspicions and informed the union of their decision to report the allegations. The Department of Labor investigated the allegations and interviewed several union employees and officials. It referred the matter to an assistant United States attorney, who declined to intervene. Aaron later notified Henry and White that they had been indefinitely laid off from employment at the union. During the pendency of Henry and White's action, Michael Dowdy and Glenn Ramsey (also business agents for the union) were terminated from their employment. Dowdy and Ramsey filed a separate WPA action in the Wayne Circuit Court against the union, Aaron, and Ruedisueli, claiming that they had been terminated for their cooperation in the Department of Labor's investigation and disclosing to investigators facts substantiating the allegations of criminal misconduct. Defendants moved for summary disposition in the Henry/White lawsuit and for partial summary disposition in the Dowdy/Ramsey lawsuit, alleging that the Labor-Management Reporting and Disclosure Act (LMRDA), 29 USC 401 *et seq.*, preempted plaintiffs' WPA claims and that, as a result, the court lacked subject-matter jurisdiction to hear them. The court, Jeanne Stempien, J., denied both motions, concluding that the WPA's protection of an employee against

©2014 State of Michigan

an employer's retaliatory employment actions does not contravene the LMRDA because the LMRDA only protects from retaliation the rights afforded union members.  Defendants appealed in each case, reasserting their claim of LMRDA preemption and raising the new defense that the National Labor Relations Act (NLRA), 29 USC 151 *et seq*., independently preempted the circuit court from exercising subject-matter jurisdiction.  The Court of Appeals, RONAYNE KRAUSE, P.J., and SAAD and WILDER, JJ., consolidated the appeals and affirmed in an unpublished opinion per curiam, issued July 3, 2012 (Docket Nos. 302373 and 302710), agreeing that plaintiffs had not alleged any infringement of their membership rights and that, as a result, the LMRDA's protections did not cover their claims.  The panel also held that the WPA did not undermine the LMRDA's purpose of giving elected union officials the discretion to implement policies that reflect the wishes of union membership because claims of wrongful discharge for refusing to commit or aid in committing a crime did not infringe the union leaders' discretion   Finally, the panel held that the NLRA did not preempt plaintiffs' claims because a claim for retaliatory discharge arising out of an employee's report of suspected illegal activity or participation in an investigation of it is only of peripheral concern to the NLRA's purpose of protecting employees' rights to engage in concerted activities for the purpose of collective bargaining or other mutual aid or protection.  The Supreme Court granted defendants' applications for leave to appeal.  493 Mich 934 (2013).

In an opinion by Justice KELLY, joined by Chief Justice YOUNG and Justices CAVANAGH, MARKMAN, MCCORMACK, and VIVIANO, the Supreme Court *held*:

Neither the National Labor Relations Act nor the Labor-Management Reporting and Disclosure Act preempts Whistleblowers' Protection Act claims premised on retaliation for reporting suspected criminal misconduct, and state courts have subject-matter jurisdiction over those claims.

1.  Preemption is fundamentally a question of congressional intent.  Congress can preempt state law either explicitly or implicitly.  In the absence of explicit statutory language, state law is preempted when it regulates conduct in a field that Congress intended the federal government to occupy exclusively or when it actually conflicts with federal law.  There is no single formula to apply preemption principles in all contexts.  Rather, a court must examine congressional intent to preempt state law in the specific context of the statute or statutes at issue, in this case how the WPA operates against the background of the NLRA and the LMRDA.

2.  With respect to the NLRA, § 7 of that act, 29 USC 157, states that employees have the rights to self-organization; form, join, or assist labor organizations; bargain collectively through representatives of their own choosing; and engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection.  Section 8(a)(1), 29 USC 158(a)(1), states that it is an unfair labor practice for an employer to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed by § 7.  The NLRA both creates federal rules regarding labor relations and delegates enforcement of that policy to an administrative agency, the National Labor Relations Board (NLRB).  When an activity is arguably subject to § 7 or § 8 of the act, the states and the federal courts must defer to the exclusive competence of the NLRB to avert the danger of state interference with national policy.  "Arguably subject" means that the party asserting preemption must advance an interpretation of the act that is not plainly contrary to its

©2014 State of Michigan

language and has not been authoritatively rejected by the courts or the board. There are two related exceptions to preemption of state law regulations that are arguably subject to § 7 or § 8. The first is when the activity regulated is merely a peripheral concern of the NLRA. The second is when the regulated conduct touches interests so deeply rooted in local feeling and responsibility that in the absence of compelling congressional direction, a court could not infer that Congress had deprived the states of the power to act. Courts must consider whether there exists a significant state interest in protecting the citizen from the challenged conduct and whether the exercise of state jurisdiction over the state claim entails little risk of interference with the regulatory jurisdiction of the NLRB. When the conduct at issue in the state litigation is arguably prohibited by the NLRA and thus within the exclusive jurisdiction of the NLRB, the critical inquiry in determining whether an exception applies is whether the controversy presented to the state court is identical with that which could be presented to the board. When it is identical, states cannot subject violators to a supplemental sanction for violations of the NLRA.

3. With respect to the LMRDA, 29 USC 411(a)(2) protects union members' freedom of expression and assembly by giving every member the right to meet and assemble freely with other members; express any views, arguments, or opinions; and express at meetings the member's views on any business properly before the meeting. It also gives union members procedural protections against discipline by the union. When a plaintiff has dual status as both an employee and a member of the union, the LMRDA only provides protection from discipline in the member's capacity as a member, not in his or her capacity as an employee. This limitation ensures the freedom of elected union leaders to choose staff whose views are compatible with their own, which is an integral part of the LMRDA's purpose of ensuring a union administration's responsiveness to the mandate of a union election. Because conduct protected under the LMRDA does not extend to a union member's rights as an employee, a state-law retaliation claim brought by a union employee as an employee is preempted to the extent that it conflicts with the LMRDA's purposes. Likewise, the LMRDA preempts state law that would unduly limit the discretion of union officials to select their employees. As a result, when a union employee brings a state-law retaliation claim as an employee, a court must analyze whether the claim conflicts with the LMRDA's purpose and goal of protecting democratic processes in union leadership. A state-law retaliation claim is not preempted when it does not conflict with the purposes of the LMRDA. The discretion the LMRDA affords unions to choose their employees is not limitless. The act does not preempt state wrongful-termination claims in cases in which elected union officials attempt to use their discretion as a shield to hide alleged criminal misconduct. Any other conclusion would undermine the explicit purpose of the LMRDA to eliminate or prevent improper practices on the part of labor organizations, employers, labor-relations consultants, and their officers and representatives. In fact, protecting union employees from retaliation when they raise claims of criminal wrongdoing helps to protect the interests of rank-and-file union members and safeguard union democracy and, as a result, achieve the purposes of the LMRDA.

4. The WPA specifically regulates an employer's retaliation against employees who report a violation or suspected violation of law. MCL 15.362 provides that an employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because the employee reports or is about to report a violation or a suspected violation of a law or regulation or rule to a

©2014 State of Michigan

public body or because an employee is requested by a public body to participate in an investigation, hearing, or inquiry held by that public body or a court action.

5. When assessing claims of NLRA preemption, it is the conduct being regulated, not the formal description of governing legal standards, that is the proper focus. The specific conduct plaintiffs alleged in their WPA claims is that defendants unlawfully retaliated against them for reporting suspected wrongdoing to the Department of Labor. Plaintiffs' allegations of wrongdoing fell into two general categories: (1) improper working conditions (that workers were paid unfairly and were not provided with necessary safety precautions) and (2) criminality (that defendants were engaged in fraud, embezzlement, and misuse of union funds). Basic to the right guaranteed to employees in § 7 of the NLRA to form, join or assist labor organizations is the right to engage in concerted activities to persuade other employees to join for their mutual aid and protection. The mutual-aid-or-protection clause in § 7 protects employees from retaliation by their employers when they seek to improve working conditions through resort to administrative and judicial forums, among other activities intended to improve working conditions. Similarly, the relevant inquiry when examining whether activity is concerted is whether the employee acted with the purpose of furthering group goals.

6. The NLRA preempted plaintiffs' WPA claims related to improper working conditions. Plaintiffs unquestionably acted with the purpose of furthering group goals when they disputed the working conditions for union members. Their claims of unfair wages and an unsafe work environment were prototypical issues of dispute under the NLRA. Therefore, plaintiffs' conduct to improve unfair wages and an unsafe work environment was arguably protected under § 7 of the NLRA, and § 8 specifically prohibited defendants from retaliating against plaintiffs for engaging in conduct protected under § 7. Neither of the two exceptions to NLRA preemption applied to plaintiffs' concerted activity regarding working conditions because those conditions are of central, not peripheral, concern to the NLRA's purposes. Because this protection has been central to the NLRA's purposes for nearly 80 years, the more recent attempt of the WPA to regulate retaliation for an alleged unfair labor practice does not touch interests so deeply rooted in local feeling and responsibility that a court could not infer that Congress intended the NLRB to have exclusive jurisdiction over a state whistleblower claim arising out of complaints regarding an employer's improper working conditions.

7. The NLRA did not preempt the WPA with respect to plaintiffs' claims alleging retaliation for reporting defendants' criminal wrongdoing. While the NLRA regulates employees' concerted activities for their mutual aid or protection, it does not regulate the reporting of federal and state crimes. Section 7 is not so broad that it protects all concerted activities by employees. At some point the relationship between the concerted activity and the employees' interests as employees becomes so attenuated that an activity cannot fairly be deemed to come within the mutual-aid-or-protection clause. The allegations of criminal misconduct that plaintiffs communicated to the Department of Labor did not relate to the employer's labor practices. Rather, a state court can adjudicate the underlying allegations of embezzlement and other criminal misconduct without having to consider an employer's labor practices or whether employees engaged in protected activity when reporting those allegations. Moreover, Michigan has a deeply rooted and substantial interest in enforcing its criminal laws, which the NLRB has no authority to enforce and which the WPA assists by protecting

©2014 State of Michigan

employees who report allegations of criminal misconduct, interests that are separate from the interests articulated in the NLRA.

8. Plaintiffs' WPA claims premised on reporting defendants' alleged criminal misconduct also survived defendants' assertion of LMRDA preemption. Although the LMRDA does not provide union employees who have been terminated a cause of action for retaliation taken against them as employees, states are not completely forbidden from restricting a union leader's discretion to terminate a union employee. If a union retaliates against a union employee as an employee, any underlying state-law retaliation claim is preempted only to the extent that it conflicts with the purposes of the LMRDA. States are afforded considerably more freedom to supplement the LMRDA federal scheme as long as no conflict arises between state law and the LMRDA. A union employer's discretion in employment decisions must yield in cases in which elected union officials attempt to use that discretion as a shield to hide alleged criminal misconduct. As a result, the LMRDA allows state-law retaliation claims to proceed in state courts.

Affirmed in part and remanded.

Justice ZAHRA, concurring in part and dissenting in part, joined the majority's opinion in Parts I, II, III(A), (C), (D), and IV(B), but dissented from Parts III(B) and IV(A) and the outcome of the case. Justice ZAHRA agreed that the LMRDA did not preempt plaintiffs' WPA claims but disagreed with the majority's conclusion that the NLRA did not preempt those claims. Conduct is arguably prohibited by the NLRA if the underlying activity that is the subject matter of the litigation is arguably subject to the protections of § 7 or the prohibitions of § 8. Plaintiffs' WPA claims were arguably subject to the NLRA because plaintiffs' reporting of alleged wrongful conduct was done to assist their labor organization by revealing that the organization's assets might be subject to depletion through fraud, embezzlement, and misuse of union funds. The union officials, in their capacity as employers, were prohibited by the NLRA from discharging their employees simply because the employees reported their suspicions of illegal activity that would harm the union. Moreover, plaintiffs' claims did not fall within what is effectively one exception to NLRA preemption for deeply rooted state interests that are of peripheral concern to the NLRA. In general, when courts determine the applicability of the exception, they effectively presume that claims grounded in state law reflect deeply rooted state interests and inquire instead whether the conduct at issue is of peripheral concern to the NLRA, engaging in a fact-intensive inquiry to decide whether both the NLRA and the state statute, as applied, prohibit the complained-of activity. When the NLRA and state law do not prohibit the same conduct, the preemption exception will apply. Plaintiffs' claims here sounded in retaliatory discharge. They reported alleged criminal conduct that triggered protection under the WPA and simultaneously assisted a labor organization, which entitled their activity to NLRA protection. Thus, both the WPA and the NLRA prohibited discharge for the protected action, and the NLRA preempted the WPA. In addition, plaintiffs' WPA claims represented a classic example of unacceptable NLRA circumvention through artful pleading. Justice ZAHRA would have reversed the judgment of the Court of Appeals and dismissed plaintiffs' WPA claims because they were preempted by the NLRA.

©2014 State of Michigan

# Opinion

Chief Justice:          Justices:

Robert P. Young, Jr.   Michael F. Cavanagh
                       Stephen J. Markman
                       Mary Beth Kelly
                       Brian K. Zahra
                       Bridget M. McCormack
                       David F. Viviano

FILED MAY 5, 2014

S T A T E   O F   M I C H I G A N

SUPREME COURT

ANTHONY HENRY and KEITH WHITE,

       Plaintiffs-Appellees,

v                                    No. 145631

LABORERS' LOCAL 1191, doing business
as ROAD CONSTRUCTION LABORERS
OF MICHIGAN LOCAL 1191, and
MICHAEL AARON,

       Defendants-Appellants,

and

BRUCE RUEDISUELI,

       Defendant-Appellee.

_____

MICHAEL RAMSEY and GLENN
DOWDY,

       Plaintiffs-Appellees,

v                                    No. 145632

LABORERS' LOCAL 1191, doing business
as ROAD CONSTRUCTION LABORERS

OF MICHIGAN LOCAL 1191, and
MICHAEL AARON,

        Defendants-Appellants,

and

BRUCE RUEDISUELI,

        Defendant-Appellee.

_____

BEFORE THE ENTIRE BENCH

KELLY, J.

This case involves whether, and the extent to which, plaintiffs' claims asserted under the Michigan Whistleblowers' Protection Act (WPA)[1] are preempted by the National Labor Relations Act (NLRA)[2] and the Labor-Management Reporting and Disclosure Act (LMRDA).[3] Plaintiffs allege that defendants violated the WPA when they discharged plaintiffs in retaliation for reporting to the United States Department of Labor their suspicions of fraud, embezzlement, improper wages, and unsafe working conditions or for participating in the Department of Labor's ensuing investigation. Defendants argue that the NLRA and LMRDA preempt plaintiffs' WPA claims and, as a result, the state court must dismiss those claims.

Congress enacted the NLRA and the LMRDA to protect the rights of employees and union members from infringement by employers and unions. The NLRA established

_____

[1] MCL 15.361 *et seq.*

[2] 29 USC 151 *et seq.*

[3] 29 USC 401 *et seq.*

2

the National Labor Relations Board (NLRB), which has exclusive jurisdiction over activity "arguably subject" to §§ 7[4] and 8[5] of the NLRA.[6] These provisions forbid an employer from interfering with an employee's right to engage in concerted activities for the mutual aid or protection of employees.[7] The LMRDA safeguards a union member's ability to elect union leadership, provides broad discretion for elected union officials to implement their policies, and protects union members who exercise their freedom of expression from retaliation by union officials.[8] More recently, the Michigan Legislature enacted the WPA to protect employees from retaliation for reporting violations or suspected violations of laws and regulations to a public body.[9]

We hold that neither the NLRA nor the LMRDA preempts WPA claims premised on reporting suspected criminal misconduct. The NLRA does not cover the reporting of suspected criminal misconduct, while the LMRDA does not provide a union official with discretion to cover up suspected criminal misconduct by retaliating against employees who report their allegations. However, plaintiffs' allegations of retaliation for their reporting of improper wages and an unsafe work environment cover conduct "arguably

---

[4] 29 USC 157.

[5] 29 USC 158.

[6] *San Diego Bldg Trades Council v Garmon*, 359 US 236, 245; 79 S Ct 773; 3 L Ed 2d 775 (1959).

[7] 29 USC 157; 29 USC 158(a)(1).

[8] 29 USC 411(a)(1), (2), and (5).

[9] MCL 15.362.

3

prohibited" by the NLRA and, as a result, must be litigated exclusively before the NLRB. Accordingly, we affirm in part the decision of the Court of Appeals and remand this case to the Wayne Circuit Court for further proceedings consistent with our opinion.

## I. FACTS AND PROCEDURAL HISTORY

Defendant Laborers' Local 1191 is a Wayne County labor union that represents construction workers. At all times relevant to these consolidated appeals, the union's member-elected leadership included its president (defendant Bruce Ruedisueli) and its business manager (defendant Michael Aaron). The union also employed several unelected business agents who serve at the pleasure of the business manager. Plaintiffs Anthony Henry and Keith White (Docket No. 145631) and Michael Ramsey and Glenn Dowdy (Docket No. 145632) all worked as business agents until their terminations.

While the facts leading up to plaintiffs' terminations are contested, it is undisputed that in September 2009, defendants asked several Local 1191 members to repair the crumbling façade of the Trade Union Leadership Council (TULC) building.[10] The work lasted for two days, and each member received $30 a day. Although Local 1191 recorded these payments as "picket duty" on the memo line of the checks used for payment and in the union's treasury, it admits that its members did not engage in picket duty on those days.

---

[10] The parties dispute the nature of the TULC. Defendants characterize the TULC as a "community-focused, non-profit entity" that provides training for laid-off employees, while plaintiffs claim that it is a "private entity separate and distinct from Local 1191" that "is licensed to sell liquor."

4

Henry witnessed the work. He and the three other plaintiffs suspected that Aaron was involved in criminal activity, including fraud, an illegal kickback scheme, and misappropriation of union funds. They also believed that Local 1191 required members to work without proper safety precautions and without receiving union wages. As a result, on September 25, 2009, Henry circulated an unsigned open letter to Local 1191's leadership and distributed that letter to union membership, the union's parent leadership, and local news outlets. In the letter, Henry asked why Local 1191 was paying members out of its picket fund to work on a for-profit establishment (the TULC) and suggested that Aaron had received illegal kickbacks from the TULC in exchange for providing the TULC with free construction labor. The letter also complained that union members received only $60 for two full days of work.

In October 2009, Henry and White contacted the United States Department of Labor with their suspicions and informed the union of their decision to report the allegations.[11] The Department of Labor investigated the allegations and interviewed several union employees and officials.[12] It subsequently referred the matter to an Assistant United States Attorney, who declined to intervene.[13]

---

[11] Henry and White also claim that they contacted the Michigan Department of Labor, although the lower court record only contains a formal report from the United States Department of Labor.

[12] Defendants frame plaintiffs' conduct in this case as primarily focused on working conditions, not about alleged criminal misconduct. However, the record belies this assertion and confirms that plaintiffs reported alleged criminal behavior to a public body. Indeed, the Department of Labor report focuses on the alleged criminal misconduct.

[13] Although major portions of the Department of Labor report are redacted in the record presented to this Court, including the reason that the Assistant United States Attorney

5

On November 11, 2009, Aaron notified Henry and White that they were indefinitely laid off from employment at Local 1191. The letters claimed that the "extremely difficult economic climate" necessitated the layoffs. Henry and White disputed that stated rationale and, instead, filed a complaint in the Wayne Circuit Court against Local 1191 as an entity and against Aaron and Ruedisueli individually, in which they alleged unlawful retaliation under the WPA.

During the pendency of that initial action, Dowdy and Ramsey were terminated from their employment at Local 1191. Dowdy and Ramsey claim that they were terminated for their cooperation in the Department of Labor investigation and for disclosing to investigators facts substantiating the allegations of criminal illegality.[14] They also filed a separate WPA complaint against Local 1191 as an entity and against Aaron and Ruedisueli individually.

Defendants moved for summary disposition in the Henry/White lawsuit and for partial summary disposition in the Dowdy/Ramsey lawsuit,[15] alleging that the LMRDA preempted plaintiffs' WPA claims and that, as a result, the circuit court lacked subject-matter jurisdiction to hear them.[16] The court denied the motions from the bench,

___

declined to intervene, the report indicates that the Department of Labor considers the matter closed.

[14] Ramsey also claimed that Ruedisueli asked him to lie at a deposition in the Henry/White lawsuit and that his refusal to do so constituted another reason for his termination.

[15] Defendants did not seek summary disposition on Ramsey's allegation that he was terminated for refusing to lie at his deposition. As a result, it is not part of the appeal before this Court.

[16] MCR 2.116(C)(4).

6

concluding that the WPA's protection of an employee against an employer's retaliatory employment actions does not contravene the LMRDA because the LMRDA only protects from retaliation the rights afforded union members.

On appeal, defendants reasserted their claim of LMRDA preemption and raised the new defense that the NLRA independently preempted the circuit court from exercising subject-matter jurisdiction. The Court of Appeals affirmed the circuit court's ruling in an unpublished opinion.[17] The Court agreed with the circuit court that plaintiffs "have not alleged any infringement on their membership rights" and that, as a result, the LMRDA's protections did not cover plaintiffs' claims.[18] The Court also examined whether the WPA undermined the LMRDA's democratic purpose to give elected union officials the discretion to implement policies that reflect the wishes of union membership. The Court concluded that plaintiffs' claims did not infringe union leaders' discretion "where a union employee claims wrongful discharge for refusing 'to commit or aid in committing a crime' . . . ."[19] Finally, the Court held that the NLRA did not preempt plaintiffs' claims because "[a] claim for retaliatory discharge arising out of an employee's report of suspected illegal activity or participation in investigation thereof is only of peripheral concern to the NLRA's purpose of protecting employees' rights to engage in

---

[17] *Henry v Laborers Local 1191*, unpublished opinion per curiam of the Court of Appeals, issued July 3, 2012 (Docket Nos. 302373 and 302710).

[18] *Id*. at 5.

[19] *Id*. at 3, quoting *Packowski v United Food & Commercial Workers Local 951*, 289 Mich App 132, 146; 796 NW2d 94 (2010).

'concerted activities for the purpose of collective bargaining or other mutual aid or protection.' "[20]

This Court granted defendants' applications for leave to appeal and requested that the parties brief

> (1) whether, regardless of the public body involved, the National Labor Relations Act (NLRA), 29 USC 151 *et seq.*, or the Labor Management Reporting and Disclosure Act (LMRDA), 29 USC 401 *et seq.*, preempt Michigan's Whistleblowers' Protection Act (WPA), MCL 15.361 *et seq.*, if the challenged conduct actually or arguably falls within the jurisdiction of the NLRA or the LMRDA; (2) whether a union employee's report to a public body of suspected illegal activity or participation in an investigation thereof is of only peripheral concern to the NLRA or the LMRDA so that the employee's claims under the WPA are not preempted by federal law; and, (3) whether the state's interest in enforcing the WPA is so deeply rooted that, in the absence of compelling congressional direction, courts cannot infer that Congress has deprived the state of the power to act.[21]

## II. STANDARD OF REVIEW

Defendants assert that federal law preempts plaintiffs' WPA claims and precludes Michigan courts from exercising subject-matter jurisdiction over them. As a result, they argue, they are entitled to summary disposition pursuant to MCR 2.116(C)(4).

Jurisdictional questions under MCR 2.116(C)(4), including whether federal statutory law preempts state law,[22] are questions of law that we review de novo.[23] In

---

[20] *Henry*, unpub op at 6, citing *Roussel v St Joseph Hosp*, 257 F Supp 2d 280, 285 (D Maine, 2003).

[21] *Henry v Laborers Local 1191*, 493 Mich 934, 934-935 (2013). Only Local 1191 and Aaron appealed the Court of Appeals' decision.

[22] Whether federal statutory law preempts state law is a question of statutory interpretation. *Detroit v Ambassador Bridge Co*, 481 Mich 29, 35; 748 NW2d 221 (2008).

deciding whether to grant a motion for summary disposition pursuant to MCR 2.116(C)(4), a court must consider "[t]he affidavits, together with the pleadings, depositions, admissions, and documentary evidence then filed in the action or submitted by the parties . . . ."[24]

## III.  ANALYSIS

### A.  GENERAL PREEMPTION PRINCIPLES

In *McCulloch v Maryland*, Chief Justice John Marshall addressed the relationship between the federal and state governments in our constitutional republic:

> If any one proposition could command the universal assent of mankind, we might expect it would be this—that the government of the Union, though limited in its powers, is supreme within its sphere of action. This would seem to result, necessarily, from its nature.  It is the government of all; its powers are delegated by all; it represents all, and acts for all. Though any one state may be willing to control its operations, no state is willing to allow others to control them.  The nation, on those subjects on which it can act, must necessarily bind its component parts.  But this question is not left to mere reason: the people have, in express terms, decided it . . . .[25]

To this end, the Framers of the Constitution drafted, and the people ratified, the Supremacy Clause, which states the core principle of preemption:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the

---

[23] *Travelers Ins Co v Detroit Edison Co*, 465 Mich 185, 205; 631 NW2d 733 (2001).

[24] MCR 2.116(G)(5).

[25] *McCulloch v Maryland*, 17 US (4 Wheat) 316, 405; 4 L Ed 579 (1819).

Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.[26]

Justice Cooley observed that the Supremacy Clause requires "[a] State law [to] yield to the supreme law, whether expressed in the Constitution of the United States or in any of its laws or treaties, so far as they come in collision . . . ."[27] However, because a state's traditional police powers are broad, the United States Supreme Court has explained that "[c]onsideration of issues arising under the Supremacy Clause 'start[s] with the assumption that the historic police powers of the States [are] not to be superseded by . . . Federal Act unless that [is] the clear and manifest purpose of Congress.' "[28]

Preemption "fundamentally is a question of congressional intent . . . ."[29] Congress can preempt state law either explicitly or implicitly.[30] "[I]n the absence of explicit statutory language, state law is pre-empted where it regulates conduct in a field that Congress intended the Federal Government to occupy exclusively"[31] or when "it actually

---

[26] US Const, art VI, cl 2.

[27] Cooley, Constitutional Law (1880), p 32.

[28] *Cipollone v Liggett Group, Inc*, 505 US 504, 516; 112 S Ct 2608; 120 L Ed 2d 407 (1992), quoting *Rice v Santa Fe Elevator Corp*, 331 US 218, 230; 67 S Ct 1146; 91 L Ed 1447 (1947).

[29] *English v Gen Electric Co*, 496 US 72, 78-79; 110 S Ct 2270; 110 L Ed 2d 65 (1990).

[30] *Id*. Of course, "when Congress has made its intent known through explicit statutory language, the courts' task is an easy one." *Id*. at 79.

[31] *Id*. Determining whether Congress intended the federal government to occupy an entire field requires examining whether " 'the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.' " *Id.*, quoting *Rice*, 331 US at 230.

10

conflicts with federal law."[32]  Nevertheless, "[i]n the final analysis, there can be no one crystal clear distinctly marked formula" to apply preemption principles in all contexts.[33] Rather, we must examine congressional intent to preempt state law in the specific context of the statute or statutes at issue—in this case, how the Michigan WPA operates against the background of the NLRA and the LMRDA.

### B.  THE NLRA

Congress enacted the National Labor Relations Act in 1935 after it concluded that "[t]he denial by some employers of the right of employees to organize and the refusal by some employers to accept the procedure of collective bargaining lead to strikes and other forms of industrial strife or unrest . . . ."[34]  The NLRA's enactment "marked a fundamental change in the Nation's labor policies."[35]  Congress replaced "[t]he earlier notion that union activity was a species of 'conspiracy' and that strikes and picketing were examples of unreasonable restraints of trade" with "an unequivocal national

---

[32] *English*, 496 US at 79.  The Court had held that federal law conflicts with state law "where it is impossible for a private party to comply with both state and federal requirements," or "where state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' "  *Id.*, quoting *Hines v Davidowitz*, 312 US 52, 67; 61 S Ct 399; 85 L Ed 581 (1941).

[33] *Hines*, 312 US at 67.

[34] 29 USC 151.

[35] *Sears, Roebuck & Co v San Diego Co Dist Council of Carpenters*, 436 US 180, 190; 98 S Ct 1745; 56 L Ed 2d 209 (1978).

declaration of policy establishing the legitimacy of labor organization and encouraging the practice of collective bargaining."[36]

Section 7 of the NLRA states that "[e]mployees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection . . . ."[37] Section 8(a)(1) states that it is an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7,"[38] while § 10(a) empowers the National Labor Relations Board "to prevent any person from engaging in any unfair labor practice . . . affecting commerce."[39]

The structure of the NLRA not only creates federal rules of decision regarding labor relations, but also delegates enforcement of that policy to an administrative agency. The United States Supreme Court has acknowledged this dual purpose of the NLRA:

> [T]he unifying consideration of our decisions has been regard to the fact that Congress has entrusted administration of the labor policy for the Nation to a centralized administrative agency, armed with its own procedures, and equipped with its specialized knowledge and cumulative experience:

---

[36] *Id*. The Court upheld the constitutionality of the NLRA against a Commerce Clause challenge in *NLRB v Jones & Laughlin Steel Corp*, 301 US 1; 57 S Ct 615; 81 L Ed 893 (1937).

[37] 29 USC 157.

[38] 29 USC 158(a)(1).

[39] 29 USC 160(a).

> . . . Congress evidently considered that centralized administration of specially designed procedures was necessary to obtain uniform application of its substantive rules and to avoid these diversities and conflicts likely to result from a variety of local procedures and attitudes towards labor controversies. . . . A multiplicity of tribunals and a diversity of procedures are quite as apt to produce incompatible or conflicting adjudications as are different rules of substantive law.[40]

Indeed, the Court has explained that "nothing could serve more fully to defeat the congressional goals underlying the Act than to subject, without limitation, the relationships it seeks to create to the concurrent jurisdiction of state and federal courts free to apply the general local law."[41]

*San Diego Building Trades Council v Garmon* is the "watershed" case analyzing "the extent to which the maintenance of a general federal law of labor relations combined with a centralized administrative agency to implement its provisions necessarily supplants the operation of the more traditional legal processes in this field"—that is, state regulation.[42] In *Garmon*, the Court explained:

> When it is clear or may fairly be assumed that the activities which a State purports to regulate are protected by § 7 of the National Labor Relations Act, or constitute an unfair labor practice under § 8, due regard for the federal enactment requires that state jurisdiction must yield. To leave the States free to regulate conduct so plainly within the central aim of federal regulation involves too great a danger of conflict between power asserted by Congress and requirements imposed by state law. Nor has it

---

[40] *Garmon*, 359 US at 242-243, quoting *Garner v Teamsters, Chauffeurs & Helpers Local Union No 776*, 346 US 485, 490-491; 74 S Ct 161; 98 L Ed 228 (1953).

[41] *Amalgamated Ass'n of Street, Electric R & Motor Coach Employees v Lockridge*, 403 US 274, 286; 91 S Ct 1909; 29 L Ed 2d 473 (1971).

[42] *Id*. at 276.

mattered whether the States have acted through laws of broad general application rather than laws specifically directed towards the governance of industrial relations.[43]

Moreover, even when it is unclear "whether the particular activity regulated by the States was governed by § 7 or § 8 or was, perhaps, outside both these sections," the Court held that "[i]t is essential to the administration of the Act that these determinations be left in the first instance to the National Labor Relations Board."[44]  Therefore, "[w]hen an activity is arguably subject to § 7 or § 8 of the Act, the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board if the danger of state interference with national policy is to be averted."[45]

The Court subsequently clarified the "arguably subject" standard to mean that "the party claiming pre-emption is required to demonstrate that his case is one that the Board could legally decide in his favor."[46]  In other words, "a party asserting pre-emption must advance an interpretation of the Act that is not plainly contrary to its language and that has not been 'authoritatively rejected' by the courts or the Board."[47]

Nevertheless, the Court "has been unwilling to 'declare pre-empted all local regulation that touches or concerns in any way the complex interrelationships between

---

[43] *Garmon*, 359 US at 244.

[44] *Id*. at 244-245.

[45] *Id*. at 245.

[46] *Int'l Longshoreman's Ass'n v Davis*, 476 US 380, 395; 106 S Ct 1904; 90 L Ed 2d 389 (1986).

[47] *Id.*

employees, employers, and unions . . . .' "[48]  To this end, *Garmon* recognized two related exceptions to preemption of state law regulations that are "arguably subject" to §§ 7 or 8 of the NLRA.  The exceptions each "examin[e] the state interests in regulating the conduct in question and the potential for interference with the federal regulatory scheme."[49]

The first *Garmon* exception is "where the activity regulated [is] a merely peripheral concern" of the NLRA.[50]  For example, even though the NLRA permits employers to hire replacement workers during a strike, the Court allowed a replacement worker's breach of contract and misrepresentation claims to proceed against the employer.[51]  In explaining that the agreements between employers and replacement workers were only peripheral concerns of the NLRA, the Court concluded that the NLRA did not require courts "to hold that either the employer or the union is . . . free to injure innocent third parties without regard to the normal rules of law governing those relationships."[52]

The second, and related, *Garmon* exception is "where the regulated conduct touch[es] interests so deeply rooted in local feeling and responsibility that, in the absence

---

[48] *Farmer v United Brotherhood of Carpenters & Joiners*, 430 US 290, 295-296; 97 S Ct 1056; 51 L Ed 2d 338 (1977), quoting *Lockridge*, 403 US at 289.

[49] *Farmer*, 430 US at 297.

[50] *Garmon*, 359 US at 243.

[51] *Belknap, Inc v Hale*, 463 US 491, 500; 103 S Ct 3172; 77 L Ed 2d 798 (1983).

[52] *Id*.

of compelling congressional direction, we could not infer that Congress had deprived the States of the power to act."[53]   Courts must consider whether "there exist[s] a significant state interest in protecting the citizen from the challenged conduct" and whether "the exercise of state jurisdiction over the [state] claim entail[s] little risk of interference with the regulatory jurisdiction of the [NLRB]."[54]   Under this exception, the Court has held, for example, that the NLRA does not preempt certain state law claims alleging intentional torts—including threats of violence,[55] trespass,[56] intentional infliction of emotional distress,[57] malicious interference with a lawful occupation,[58] and malicious libel.[59]

When the conduct at issue in the state litigation is "arguably prohibited" by the NLRA and thus within the exclusive jurisdiction of the NLRB, the critical inquiry in determining whether an exception applies "is whether the controversy presented to the state court is identical with that which could be presented to the Board."[60]   When it is

---

[53] *Garmon*, 359 US at 244.

[54] *Sears, Roebuck*, 436 US at 196.

[55] *Youngdahl v Rainfair, Inc*, 355 US 131, 139; 78 S Ct 206; 2 L Ed 2d 151 (1957).

[56] *Sears, Roebuck*, 436 US at 207.

[57] *Farmer*, 430 US at 302.

[58] *UAW v Russell*, 356 US 634, 646; 78 S Ct 932; 2 L Ed 2d 1030 (1958).

[59] *Linn v United Plant Guard Workers*, 383 US 53, 62; 86 S Ct 657; 15 L Ed 2d 582 (1966).

[60] *Belknap*, 463 US at 510.  Of course, a conclusion that the NLRA preempts a state law claim does not require the claim to have been presented to the NLRB.  Rather, the claim is preempted if it *could* have been presented there and neither of the exceptions applies. Moreover, even if a claim is preempted, the NLRB may decide *not* to exercise its jurisdiction on a particular claim.  Nevertheless, whether the NLRB will *exercise* its

identical, the Court has determined that states cannot subject violators to "a supplemental sanction for violations of the NLRA . . . ."[61]

## C. THE LMRDA

Congress enacted the Labor-Management Reporting and Disclosure Act in 1959 as "the product of congressional concern with widespread abuses of power by union leadership."[62]  The United States Supreme Court explained that "allegations of union wrongdoing led to extended congressional inquiry" and resulted in "enlarged protection for members of unions paralleling certain rights guaranteed by the Federal Constitution; not surprisingly, these amendments . . . were introduced under the title of 'Bill of Rights of Members of Labor Organizations.' "[63]

The LMRDA's Bill of Rights of Members of Labor Organizations protects union members' freedom of expression and assembly:

> Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions; and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon

jurisdiction (or has been given an option to exercise its jurisdiction) is distinct from whether the NLRB has jurisdiction over the claim. *Calabrese v Tendercare of Mich, Inc*, 262 Mich App 256, 264; 685 NW2d 313 (2004).

[61] *Wisconsin Dep't of Indus, Labor & Human Relations v Gould Inc*, 475 US 282, 288; 106 S Ct 1057; 89 L Ed 2d 223 (1986).

[62] *Finnegan v Leu*, 456 US 431, 435; 102 S Ct 1867; 72 L Ed 2d 239 (1982).  The LMRDA is also known as the Landrum-Griffin Act. *Black's Law Dictionary* (9th ed), p 957.  One of the LMRDA's principal coauthors, then Representative Robert P. Griffin, served on this Court from 1987 to 1994.

[63] *Finnegan*, 456 US at 435.

any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings[.][64]

It also provides union members with procedural protections against discipline by the union:

> No member of any labor organization may be fined, suspended, expelled, or otherwise disciplined except for nonpayment of dues by such organization or by any officer thereof unless such member has been (A) served with written specific charges; (B) given a reasonable time to prepare his defense; (C) afforded a full and fair hearing.[65]

"Any person whose rights secured by the [Bill of Rights of Members of Labor Organizations] have been infringed by any violation of this title may bring a civil action in a district court of the United States for such relief (including injunctions) as may be appropriate."[66]

In *Finnegan v Leu*, the Supreme Court explained that "[i]t is readily apparent, both from the language of these provisions and from the legislative history . . . , that it was

---

[64] 29 USC 411(a)(2).

[65] 29 USC 411(a)(5).

[66] 29 USC 412.  The LMRDA also contains two saving provisions.  The title containing the Bill of Rights specifies that "[n]othing contained in this title shall limit the rights and remedies of any member of a labor organization under any State or Federal law or before any court or other tribunal, or under the constitution and bylaws of any labor organization."  29 USC 413.  Additionally, the LMRDA generally states:

> Except as explicitly provided to the contrary, nothing in this Act shall reduce or limit the responsibilities of any labor organization or any officer, agent, shop steward, or other representative of a labor organization, or of any trust in which a labor organization is interested, under any other Federal law or under the laws of any State, and, except as explicitly provided to the contrary, nothing in this Act shall take away any right or bar any remedy to which members of a labor organization are entitled under such other Federal law or law of any State.  [29 USC 523(a).]

rank-and-file union members—not union officers or employees, as such—whom Congress sought to protect."[67] The Court explained that when plaintiffs have "dual status as both employees and members of the Union,"[68] the LMRDA only provides a member/employee with protection from discipline in his or her capacity as a member, not in his or her capacity as an employee:

> [T]he term "discipline" . . . refers only to retaliatory actions that affect a union member's rights or status *as a member* of the union. . . . In contrast, discharge from union employment does not impinge upon the incidents of union membership, and affects union members only to the extent that they happen also to be union employees.[69]

This limitation ensures "the freedom of an elected union leader to choose a staff whose views are compatible with his own."[70] This is "an integral part" of the LMRDA's purpose "of ensuring a union administration's responsiveness to the mandate of the union election."[71]

*Finnegan* did not examine the LMRDA in the context of preemption—no Supreme Court decision has—but several lower courts have done so. Because conduct protected under the LMRDA does not extend to a union member/employee's rights as *an employee*, a state-law retaliation claim brought by a union employee as an employee is preempted to the extent that it conflicts with the LMRDA's purposes. Because "the

---

[67] *Finnegan*, 456 US at 436-437.

[68] *Id.* at 437.

[69] *Id.* at 437-438.

[70] *Id.* at 441.

[71] *Id.*

courts have been reluctant to interfere with the right of elected union officers to select their own administrators,"[72] which is protected under the LMRDA, we likewise hold that the LMRDA preempts state law that would unduly limit the discretion of union officials to select their employees.

As a result, when a union employee brings a state-law retaliation claim as an employee, we must analyze whether the claim conflicts with the LMRDA's "purpose and goal of protecting democratic processes in union leadership."[73] In *Packowski v United Food & Commercial Workers Local 951*, for example, the Court of Appeals explained that "[i]f union members cannot choose their leaders, or if the chosen leaders cannot implement the policies they were elected to implement, then the rights of union members (as represented by their elected leaders) would be thwarted, or at least diminished."[74]

Nevertheless, a state-law retaliation claim is not preempted when it does not conflict with the purposes of the LMRDA. Indeed, courts have recognized that the discretion the LMRDA affords unions to choose their employees is not limitless. In *Bloom v Gen Truck Drivers, Office, Food & Warehouse Union*, the United States Court of Appeals for the Ninth Circuit held that the LMRDA did not preempt a state claim for wrongful discharge after a union employee refused to illegally alter the minutes of a

---

[72] *Cehaich v UAW*, 710 F2d 234, 239 (CA 6, 1983).

[73] *Packowski*, 289 Mich App at 149.

[74] *Id*. Because the instant WPA claims implicate allegations of criminal wrongdoing not existing in *Packowski*, we need not—and do not—determine the validity of the LMRDA preemption doctrine used by the Court of Appeals in *Packowski*.

20

union meeting.[75] The court balanced the state's interest in deterring crime with the purpose of the LMRDA, explaining that "[i]f federal labor law preempts such a cause of action, the deterrent effect is lost and nothing prevents unscrupulous employers from forcing employees to choose between committing crimes and losing their jobs."[76] Furthermore, "[t]he kind of discharge alleged, retaliation for refusal to commit a crime and breach a trust, is not the kind sanctioned by the Act" to further the goals and policies of elected union officials.[77] Rather, "[p]rotecting such a discharge by preempting a state cause of action based on it does nothing to serve union democracy or the rights of union members; it serves only to encourage and conceal such criminal acts and coercion by union leaders."[78]

We adopt the exception to LMRDA preemption articulated in *Bloom* and related cases. Accordingly, we hold that the LMRDA does not preempt state wrongful-termination claims in cases in which elected union officials attempt to use their discretion as a shield to hide alleged criminal misconduct. To hold otherwise would undermine the explicit purpose of the LMRDA "to eliminate or prevent improper practices on the part of

---

[75] *Bloom v Gen Truck Drivers, Office, Food & Warehouse Union*, 783 F2d 1356 (CA 9, 1986).

[76] *Id.* at 1361

[77] *Id.* at 1362.

[78] *Id.* Similarly, two years after *Bloom*, the Colorado Court of Appeals held that the LMRDA did not preempt a state-law wrongful-discharge claim "insofar as [the plaintiff] allege[d] that he was discharged because he refused to aid [the union's business manager] in his alleged criminal misuse of union funds." *Montoya v Int'l Brotherhood of Electrical Workers Local Union III*, 755 P2d 1221, 1224 (Colo App, 1988).

21

labor organizations, employers, labor relations consultants, and their officers and representatives . . . ."[79]   In fact, protecting union employees from retaliation when they raise claims of criminal wrongdoing helps to protect the interests of rank-and-file union members and safeguard union democracy and, as a result, achieve the purposes of the LMRDA.

## D.  THE WPA

The Legislature enacted the WPA in 1980 to " 'provide protection to employees who report a violation or suspected violation of state, local, or federal law . . . .' "[80] The WPA "remove[s] barriers that may interfere with employee efforts to report those violations or suspected violations, thus establishing a cause of action for an employee who has suffered an adverse employment action for reporting or being about to report a violation or suspected violation of the law."[81]

MCL 15.362 specifically regulates an employer's retaliation against employees who report a violation or suspected violation of law:

> An employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because the employee, or a person acting on behalf of the employee, reports or is about to report,

---

[79] 29 USC 401(c).  See also 29 USC 401(b) (finding that "there have been a number of instances of breach of trust, corruption, disregard of the rights of individual employees, and other failures to observe high standards of responsibility and ethical conduct").

[80] *Whitman v City of Burton*, 493 Mich 303, 312; 831 NW2d 223 (2013), quoting the title of 1980 PA 469.

[81] *Whitman*, 493 Mich at 312, citing *Dolan v Continental Airlines/Continental Express*, 454 Mich 373, 378-379; 563 NW2d 23 (1997).

verbally or in writing, a violation or a suspected violation of a law or regulation or rule promulgated pursuant to law of this state, a political subdivision of this state, or the United States to a public body, unless the employee knows that the report is false, or because an employee is requested by a public body to participate in an investigation, hearing, or inquiry held by that public body, or a court action.

Defendants argue that federal law preempts plaintiffs' WPA claims. Because courts examine preemption under the NLRA separately from preemption under the LMRDA, as shown earlier, we will likewise consider each federal statute separately in determining whether federal law preempts plaintiffs' WPA actions.[82]

## IV. APPLICATION

## A. NLRA PREEMPTION

In assessing claims of NLRA preemption, the Supreme Court has clarified that "[i]t is the conduct being regulated, not the formal description of governing legal standards, that is the proper focus of concern."[83] The specific conduct alleged in plaintiffs' WPA claims is that defendants unlawfully retaliated against them for their reporting of suspected wrongdoing to the United States Department of Labor. Plaintiffs' allegations of wrongdoing fall into two general categories: (1) improper working conditions—that workers were paid unfairly and were not provided with necessary safety precautions—and (2) criminality—that defendants were engaged in fraud, embezzlement,

---

[82] Although defendants raised this issue of NLRA preemption for the first time before the Court of Appeals, preemption is a question of subject-matter jurisdiction. As such, this Court must consider it. *Davis*, 476 US at 393 ("A claim of *Garmon* pre-emption is a claim that the state court has no power to adjudicate the subject matter of the case, and when a claim of *Garmon* pre-emption is raised, it must be considered and resolved by the state court.").

[83] *Lockridge*, 403 US at 292.

and misuse of union funds. Because a court may separate preempted claims from nonpreempted claims,[84] we will examine each category of claims separately in determining whether the NLRA preempts plaintiffs' claims.

As stated, the threshold inquiry in determining whether the NLRA preempts state-law claims is to determine whether "an activity is arguably subject to § 7 or § 8 of the Act . . . ."[85] Among other protections, § 7 of the NLRA provides employees the right "to form, join, or assist labor organizations" and "engage in . . . concerted activities for the purpose of collective bargaining or other mutual aid or protection . . . ."[86] These rights are intertwined: "Basic to the right guaranteed to employees in § 7 to form, join or assist labor organizations, is the right to engage in concerted activities to persuade other employees to join for their mutual aid and protection."[87] Defendants claim that all of plaintiffs' activities are "arguably subject" to § 7.

The Court has held that the "mutual aid or protection clause" in § 7 "protects employees from retaliation by their employers when they seek to improve working conditions through resort to administrative and judicial forums," among other activities

---

[84] See *Farmer*, 430 US at 301-302 (noting that a rigid application of *Garmon* might support the conclusion that the "entire action was preempted by federal law" but in this case allowing only a claim of intentional infliction of emotional distress to proceed in state court).

[85] *Garmon*, 359 US at 245.

[86] 29 USC 157.

[87] *NLRB v Drivers, Chauffeurs, Helpers, Local Union No 639*, 362 US 274, 279; 80 S Ct 706; 4 L Ed 2d 710 (1960).

intended to improve working conditions.[88] Similarly, the relevant inquiry in examining whether activity is "concerted" within the meaning of the NLRA is "whether the employee acted with the purpose of furthering group goals."[89]

Plaintiffs unquestionably acted with the purpose of furthering group goals when they disputed the working conditions for union members. Their claims of unfair wages and an unsafe work environment are prototypical issues of dispute under the NLRA.[90] As a result, plaintiffs' conduct to improve unfair wages and an unsafe work environment is arguably protected under § 7 of the NLRA. Furthermore, § 8 specifically prohibits defendants from retaliating against plaintiffs for engaging in conduct protected under § 7. Accordingly, plaintiffs' conduct regarding working conditions satisfies the initial *Garmon* threshold, such that federal law would preempt state law unless one of the two exceptions applies.[91]

---

[88] *Eastex, Inc v NLRB*, 437 US 556, 566; 98 S Ct 2505; 57 L Ed 2d 428 (1978).

[89] *Compuware Corp v NLRB*, 134 F3d 1285, 1288 (CA 6, 1998).

[90] See *Platt v Jack Cooper Transp, Co, Inc*, 959 F2d 91, 94 (CA 8, 1992) ("Platt's claim that he was discharged in retaliation for making safety complaints satisfies the threshold test for *Garmon* preemption.").

[91] Plaintiffs argue that union members were not employees within the meaning of the NLRA and that, as a result, they were not engaging in concerted activities. Rather, plaintiffs characterize the union members who worked on the TULC project as volunteers who are not protected by the NLRA. Indeed, the NLRB has stated that unpaid volunteers are not employees within the meaning of the NLRA because "there is no economic aspect to their relationship with the Employer, either actual or anticipated." *WBAI Pacifica Foundation and United Electrical, Radio & Machine Workers of America*, 328 NLRB 1273, 1275 (1999). Nevertheless, we reject this argument as it applies to plaintiffs. The union members who worked on the TULC project *did* have an economic aspect to their relationship with the union—they were engaged in work for hire and "receive[d] compensation for labor or services" in the amount of $30 a day. *Id*. More importantly,

25

Moreover, neither of the two exceptions to the NLRA applies to plaintiffs' concerted activity regarding working conditions. First, working conditions are of central, not peripheral, concern to the NLRA's purposes. As stated, the NLRA specifically sought to protect the right of employees to organize to improve their working conditions. Relatedly, because this protection has been central to the NLRA's purposes for nearly 80 years, the more recent attempt of the WPA to regulate retaliation for an alleged unfair labor practice does not "touch[] interests so deeply rooted in local feeling and responsibility"[92] that the Court could not infer that Congress intended the NLRB to have exclusive jurisdiction over a state whistleblower claim arising out of complaints regarding an employer's improper working conditions. Indeed, allowing plaintiffs' WPA claim regarding defendants' working conditions would amount to "a supplemental sanction for violations of the NLRA," which the NLRA prohibits.[93]

Nevertheless, in addition to their claims of retaliation for reporting working conditions, plaintiffs also make independent assertions that defendants retaliated against them for reporting allegations of criminal misconduct.[94] Plaintiffs reported to the Department of Labor and reiterated in the instant WPA complaints that union members

there is no question that *plaintiffs* were employees within the meaning of the NLRA and that they were allegedly retaliated against for complaining to their employer about its labor practices.

[92] *Garmon*, 359 US at 244.

[93] *Gould*, 475 US at 288.

[94] These assertions are independent in the sense that they do not rely on the working-condition assertions for their validity and, accordingly, can be assessed separately from them.

were receiving money "paid out of the Union treasury . . . attributed to 'Picket line' duty when that clearly was not the case" and that they reported "their suspicions of fraud and illegal activity on the part of their employer."[95]  Indeed, in recognizing the potential illegal nature of the union officials' actions, the Department of Labor referred the matter for investigation by an Assistant United States Attorney.

While the NLRA regulates employees' concerted activities for their mutual aid or protection, it simply does not regulate the reporting of federal and state crimes.[96] Section 7 is not so broad as to protect *all* employees' concerted activities.  "[A]t some point the relationship" between the concerted activity and the "employees' interests as employees . . . becomes so attenuated that an activity cannot fairly be deemed to come within the 'mutual aid or protection' clause."[97]  The NLRB has explained that protection under § 7 "can be lost whenever employee communications to third parties do not relate

---

[95] The Department of Labor's investigation report corroborates this claim and states that the department investigated allegations that Aaron "stole or misused strike/picket funds."

[96] That the Department of Labor referred the matter to the United States Attorney's office corroborates this claim.  While the partial dissent correctly identifies 29 USC 501(c), the federal law prohibiting embezzlement from a union, as relevant to this case, its significance as a criminal offense *outside* the NLRA shows why reporting a suspected violation of 29 USC 501(c) does not arguably fall within the protections of the NLRA. Significantly, while the NLRB "is empowered . . . to prevent any person from engaging in any unfair labor practice," 29 USC 160(a), the power of the NLRB does not extend to enforce 29 USC 501(c) or, indeed, any criminal law.  See *Republic Steel Corp v NLRB*, 311 US 7, 10; 61 S Ct 77; 85 L Ed 6 (1940) (stating that the NLRA "does not carry a penal program declaring the described unfair labor practices to be crimes" and "does not prescribe penalties or fines in vindication of public rights or provide indemnity against community losses as distinguished from the protection and compensation of employees").

[97] *Eastex*, 437 US at 567-568.

to [the] labor practices of the employer . . . ."[98]  The allegations of criminal misconduct that plaintiffs communicated to the Department of Labor do not relate to the employer's labor practices.   Rather, a state court can adjudicate the underlying allegations of embezzlement and other criminal misconduct without having to consider an employer's labor practices or whether employees engaged in protected activity in reporting those allegations.[99]   By contrast, the relationship between allegations of improper working conditions and employees' protected activity gets to the heart of the employer's labor practices.

The crux of the partial dissent's disagreement with our analysis is over whether plaintiffs' assertions of defendants' violations of the federal laws regarding their fiduciary obligations toward the union and protecting union funds from embezzlement are arguably within the right of an employee under § 7 to "assist labor organizations." Courts ordinarily have examined the phrase "form, join, or assist labor organizations" in

---

[98] *Handicabs, Inc and Trail*, 318 NLRB 890, 896 (1995).  The fact that the NLRB provided nonexclusive examples of unprotected conduct when stating this rule does not render the rule any less relevant to this circumstance—there must be a relationship between the communication and the employees' interests *as employees*.

[99] Indeed, one hypothetical scenario suffices to illustrate why this is so.  Suppose that plaintiffs' claim of improper wage and unsafe working conditions simply did not exist and, instead, that defendants paid union members a bargained-for wage and the members repaired the TULC building under safe working conditions.  In this scenario, plaintiffs would still be able to allege that defendants misappropriated union funds for unlawfully paying those union members their bargained-for wage out of the picket fund when the members did not actually engage in picket duty and that defendants received illegal kickbacks from the TULC.  By stripping away plaintiffs' claims of unsafe working conditions and unfair wages that are preempted by the NLRA, it becomes clear that plaintiffs' criminal-misconduct claims exist independently.

28

§ 7 its entirety, suggesting a continuum of protections. Yet when the term "assist" has been given independent force, it appears in the context of a *nonmember's* assistance to the labor organization.[100] Furthermore, even when interpreting the term "assist" independently, courts have examined it in the context of the phrase "mutual aid or protection,"[101] perhaps because assisting a labor organization is supposed to be for the mutual aid or protection of the employees that it represents. For all these reasons, the partial dissent's focus on the phrase "assist[ing] labor organizations" without reference to the "mutual aid or protection" analysis is unpersuasive.

Even if the underlying allegations of criminal misconduct brought to light by concerted activity *arguably* relate to an employer's labor practices, enforcement of well-established criminal law is at the heart of a state's police power and is "so deeply rooted in local feeling and responsibility"[102] that we cannot infer that Congress intended when it enacted the NLRA to relieve states from enforcing that well-established criminal law or

---

[100] *Southern Greyhound Lines and Anderson*, 169 NLRB 627, 628 (1968) ("It is well settled that Section 7 of the Act protects an employee in his right to assist a labor organization regardless of whether he is eligible for membership in it . . . ."). See also *Signal Oil & Gas Co v NLRB*, 390 F 338, 343 (CA 9, 1968) (affirming the trial examiner's finding that the employee's prounion speech " 'may be regarded as an expression of support for the proposed union activity of his fellow employees, made in anticipation that he or his group might receive similar support should the occasion arise' ").

[101] *NLRB v Rockaway News Supply Co*, 197 F2d 111, 113 (CA 2, 1952) (stating that a nonmember's refusal to cross a picket line "is frequently of assistance to the labor organization whose picket line is respected, and it is in a broad but very real sense *directed to mutual aid or protection*"), aff'd 345 US 71 (1953) (emphasis added).

[102] *Garmon*, 359 US at 244.

protecting from retaliation employees who report allegations of criminal wrongdoing.[103]

A state's prohibition of adverse employment actions resulting from the reporting of suspected criminal misconduct does not " 'frustrate effective implementation of the Act's processes.' "[104] Moreover, when there are "discrete concerns of the federal scheme and the state tort law, that potential for interference is insufficient to counterbalance the legitimate and substantial interest of the State in protecting its citizens."[105] In this case, the state has a deeply rooted and substantial interest in enforcing its criminal law,[106] which the NLRB has no authority to enforce[107] and which the WPA assists by protecting employees who report allegations of criminal misconduct.[108] Because these interests are

---

[103] See, e.g., *Metro Life Ins Co v Massachusetts*, 471 US 724, 756; 105 S Ct 2380; 85 L Ed 2d 728 (1985) (holding that the NLRA does not preempt state police power even to the extent that the police power prescribes minimum labor standards applicable to employers).

[104] *Int'l Ass'n of Machinists & Aerospace Workers v Wisconsin Employment Relations Comm*, 427 US 132, 148; 96 S Ct 2548; 49 L Ed 2d 396 (1976), quoting *Brotherhood of R Trainmen v Jacksonville Terminal Co*, 394 US 369, 380; 89 S Ct 1109; 22 L Ed 2d 344 (1969).

[105] *Farmer*, 430 US at 304.

[106] In addition to alleging violations of federal criminal statutes, plaintiffs also alleged violation of MCL 750.174, the state-law crime of embezzlement.

[107] *Republic Steel*, 311 US at 10 ("[The NLRA] does not prescribe penalties or fines in vindication of public rights or provide indemnity against community losses as distinguished from the protection and compensation of employees.").

[108] The partial dissent cites *Kilb v First Student Transp, LLC*, 157 Wash App 280; 236 P3d 968 (2010), for the proposition that the NLRA preempted a state-law retaliation claim alleging that the plaintiff was discharged for attempting to assist a union. However, the retaliation in *Kilb* did not implicate the state's interest in enforcing its criminal law. Rather, the plaintiff claimed that he was discharged from his supervisory position for refusing to undertake antiunion tactics and that "his discharge violated the

separate from the interests articulated in the NLRA, we hold that the NLRA does not preempt the WPA with respect to plaintiffs' claims alleging retaliation for reporting defendants' criminal wrongdoing.

## B.  LMRDA PREEMPTION

Defendants also assert that the LMRDA preempts plaintiffs' WPA claims.[109]  As stated, the LMRDA safeguards union democracy by protecting union members' right to free expression and by providing democratically elected union leaders wide discretion in pursuing the policies that they were elected to accomplish.  The Supreme Court held in *Finnegan* that "the freedom of an elected union leader to choose a staff whose views are compatible with his own" is "an integral part" of the LMRDA's protections because an elected union leadership must be responsive "to the mandate of the union election."[110]  However, *Finnegan* does not stand for the proposition that the LMRDA gives an elected union leader unfettered discretion with respect to employment matters.  Although the LMRDA does not provide union employees who have been terminated a cause of action

right of employees to organize and form unions, . . . in contravention of Washington State's clearly established public policy against interfering with these rights."  *Id*. at 284 (citation omitted).  Unlike here, then, the conduct at issue in *Kilb* was directly within the NLRA's protections.  *Id*. at 288 ("An employer's discharge of a supervisor for refusing to commit unfair labor practices is, at least arguably, a violation of [29 USC 158(a)(1)].").

[109] Because we hold that the NLRA preempts plaintiffs' WPA claims to the extent that they allege defendants' unfair labor practices related to working conditions, we need not examine those preempted claims within the context of the LMRDA.  Accordingly, our analysis of the LMRDA focuses only on plaintiffs' claims relating to their allegations of defendants' criminal activity.

[110] *Finnegan*, 456 US at 441.

31

for retaliation taken against them as employees, this does not lead to the conclusion that states are completely forbidden from restricting a union leader's discretion to terminate a union employee. Rather, if a union retaliates against a union employee as an employee, then any underlying state-law retaliation claim is only preempted to the extent that it conflicts with the purposes of the LMRDA. The LMRDA is contrasted against the more expansive federal preemption doctrine of the NLRA—states are afforded considerably more freedom to supplement the LMRDA federal scheme as long as no conflict arises between state law and the LMRDA.[111] Moreover, although the saving clauses of the LMRDA do not directly apply to save plaintiffs' civil action, they do support a finding that the LMRDA both recognizes a strong state interest in protecting against criminal misconduct and implicitly approves plaintiffs' cause of action.[112]

Accordingly, the exception to a union employer's discretion for allegations of criminal misconduct is conclusive in this case. A union employer's discretion in employment decisions must yield in cases in which elected union officials attempt to use that discretion as a shield to hide alleged criminal misconduct. Of course, while *Bloom* involved union employees who claim that they were fired for refusing to commit crimes themselves, this case involves union employees who claim that they were fired for reporting union officials' alleged crimes. This distinction is without a difference because,

---

[111] We also note that, unlike the NLRA, the LMRDA does not create a separate administrative board to consider violations of its provisions. Rather, it creates a cause of action that a union member may pursue in a district court of the United States. 29 USC 412.

[112] See *Bloom*, 783 F2d at 1361-1362.

in both cases, the relationship between the state-law claim and the LMRDA is identical: the union employer is retaliating against employees and, in doing so, trying to shield alleged criminal misconduct from union rank-and-file membership and the public. Moreover, in both cases, the state-law claims are consistent with the LMRDA's expressly stated purposes of abating union corruption and breaches of trust. As a result, the LMRDA allows state-law retaliation claims to proceed in state courts. Therefore, we hold that plaintiffs' WPA claims premised on their reporting of defendants' alleged criminal misconduct survive defendants' assertion of LMRDA preemption.

## V. CONCLUSION

The Court of Appeals correctly determined that federal law did not preempt plaintiffs' WPA claims premised on their allegations of criminal misconduct. However, the court did not distinguish these WPA claims from plaintiffs' claims involving defendants' working conditions. As a result, we affirm the Court of Appeals' decision only in part. Going forward, plaintiffs may only pursue in state court their WPA claims involving retaliation for their reporting of alleged illegal conduct to a public body or bodies.[113]

Because neither the NLRA nor the LMRDA preempts plaintiffs' WPA claims to the extent that they allege retaliation for reporting criminal misconduct such as fraud and embezzlement, state courts have subject-matter jurisdiction over those claims.

---

[113] As stated, this decision does not involve Ramsey's separate and individual allegation that he was terminated for refusing to perjure himself.

33

Accordingly, we affirm in part the decision of the Court of Appeals and remand this case to the Wayne Circuit Court for further proceedings consistent with our opinion.

Mary Beth Kelly
Robert P. Young, Jr.
Michael F. Cavanagh
Stephen J. Markman
Bridget M. McCormack
David F. Viviano

STATE OF MICHIGAN

SUPREME COURT


ANTHONY HENRY and KEITH WHITE,

       Plaintiffs-Appellees,

v                                    No. 145631

LABORERS' LOCAL 1191, doing business
as ROAD CONSTRUCTION LABORERS
OF MICHIGAN LOCAL 1191, and
MICHAEL AARON,

       Defendants-Appellants,

and

BRUCE RUEDISUELI,

       Defendant-Appellee.

---

MICHAEL RAMSEY and GLENN
DOWDY,

       Plaintiffs-Appellees,

v                                    No. 145632

LABORERS' LOCAL 1191, doing business
as ROAD CONSTRUCTION LABORERS
OF MICHIGAN LOCAL 1191, and
MICHAEL AARON,

       Defendants-Appellants,

and

BRUCE RUEDISUELI,

       Defendant-Appellee.

---

ZAHRA, J. (*concurring in part and dissenting in part*).

Though I join the majority's opinion in Parts I, II, III(A), (C), and (D), and IV(B), I write separately to dissent from Parts III(B) and IV(A) and the outcome of the case. I agree with the majority's conclusion that the Labor-Management Reporting and Disclosure Act[1] does not preempt plaintiffs' Whistleblowers' Protection Act (WPA)[2] claims. But I respectfully dissent from the majority's conclusion that the National Labor Relations Act (NLRA)[3] does not preempt plaintiffs' WPA claims. I conclude that plaintiffs' WPA claims are arguably subject to the NLRA because plaintiffs' reporting of alleged wrongful conduct was done to assist their labor organization. I further conclude that plaintiffs' WPA claims do not fall within any preemption exception. Finally, I conclude that plaintiffs' WPA claims represent a classic example of unacceptable NLRA circumvention through artful pleading. I would reverse the judgment of the Court of Appeals and dismiss plaintiffs' WPA claims because they are preempted by the NLRA.

## I. APPLICABLE LAW: NLRA PREEMPTION AND ITS EXCEPTIONS

I am in agreement with the *general* legal propositions stated by the majority with regard to NLRA preemption and its exceptions. As noted by the majority, *San Diego Bldg Trades Council v Garmon*[4] is the seminal case governing the extent of NLRA

---

[1] 29 USC 401 *et seq.*

[2] MCL 15.361 *et seq.*

[3] 29 USC 151 *et seq.*

[4] *San Diego Bldg Trades Council v Garmon*, 359 US 236; 79 S Ct 773; 3 L Ed 2d 775 (1959).

preemption. *Garmon* provides the following preemption rule: "When an activity is arguably subject to § 7[5] or § 8[6] of the [NLRA], the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board."[7] But I also find guidance from the United States Supreme Court's subsequent case, *Local 100, United Ass'n of Journeymen & Apprentices v Borden*, in which the Court stated:

> [I]n the absence of an overriding state interest . . . , state courts must defer to the exclusive competence of the National Labor Relations Board in cases in which *the activity that is the subject matter of the litigation* is arguably subject to the *protections* of § 7 or the *prohibitions* of § 8 of the National Labor Relations Act.[8]

The standard for "arguably subject" is permissive. An activity that is the subject matter of the litigation at hand is "arguably subject" to the protections of § 7 or the prohibitions of § 8 if it "is not plainly contrary to [the NLRA's] language and . . . has not been 'authoritatively rejected' by the courts or the Board."[9]

The majority relies on *Belknap, Inc v Hale* for the proposition that conduct is "arguably prohibited" by the NLRA when "the controversy presented to the state court is identical with that which could be presented to the Board."[10] While this is a correct

---

[5] 29 USC 157.

[6] 29 USC 158.

[7] *Garmon*, 359 US at 245.

[8] *Local 100, United Ass'n of Journeymen & Apprentices v Borden*, 373 US 690, 693; 83 S Ct 1423; 10 L Ed 2d 638 (1963) (emphasis added).

[9] *Int'l Longshoreman's Ass'n v Davis*, 476 US 380, 395, 106 S Ct 1904, 90 L Ed 2d 389 (1986).

[10] *Belknap, Inc v Hale*, 463 US 491, 510; 103 S Ct 3172; 77 L Ed 2d 798 (1983).

3

statement of the law, I take issue with the majority's interpretation of this passage as whether the "state law *claim . . .* could have been presented [to the NLRB]."[11] This is, in my view, an incorrect interpretation. The more precise interpretation is whether the underlying "activity that is the *subject matter* of the litigation is arguably subject to the protections of § 7 or the prohibitions of § 8"[12]—the same inquiry as in *Garmon*.

After a court determines that certain activity is arguably subject to the protections of § 7 or the prohibitions of § 8 of the NLRA, the matter will only be preempted if it is also determined that no exception to NLRA preemption applies. A claim arising from an "activity" that is "arguably subject" to the NLRA may be adjudicated by a state or federal court if the

> activity that otherwise would fall within the scope of *Garmon . . .* was a merely *peripheral concern* of the [NLRA] or touched interests so *deeply rooted* in local feeling and responsibility that, in the absence of compelling congressional direction, we could not infer that Congress had deprived the States of the power to act.[13]

## II.  APPLICATION OF THE LAW TO THE FACTS

### A.  "ARGUABLY SUBJECT" TO THE NLRA

Unlike the majority, I conclude that plaintiffs' WPA claims are "arguably subject" to the NLRA.  I start my analysis by reviewing the activity that is the subject matter of

---

[11] Emphasis altered.

[12] *Borden*, 373 US at 693 (emphasis added).

[13] *Farmer v United Brotherhood of Carpenters & Joiners*, 430 US 290, 296-297; 97 S Ct 1056; 51 L Ed 2d 338 (1977) (emphasis added) (quotation marks, citation, and original alterations omitted).

4

this litigation—plaintiffs' claims that they were wrongfully discharged for reporting their suspicions of wrongdoing to the United States Department of Labor (USDOL). Accepting as true plaintiffs' assertions of wrongdoing, plaintiffs were assisting their labor organization, Laborers' Local 1191, by exposing that the organization's assets might be subject to depletion through fraud, embezzlement, and misuse of union funds. By exposing this conduct, plaintiffs clearly hoped to bring an end to this activity, thereby preserving the integrity, effectiveness, and financial assets of their union.

The provisions of the NLRA clearly give plaintiffs the right to engage in the conduct that they did. That right may be found in § 7 of the NLRA, which states that all "[e]mployees shall have the right to . . . assist labor organizations . . . ."[14] Additionally, employers are prohibited from engaging in "unfair labor practice[s]" by § 8 of the NLRA, which bars "interfer[ing] with, restrain[ing], or coerc[ing] employees in the exercise of the rights guaranteed in section 7[.]"[15] These two NLRA provisions apply in this case. Plaintiffs are undoubtedly employees of the labor union, entitled to the protections of

---

[14] 29 USC 157. Section 7 states in full:

> Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in [29 USC 158(a)(3)].

[15] 29 USC 158(a)(1).

§ 7.[16] The labor union, in its relationship to plaintiffs as their employer, is clearly subject to the restrictions in the NLRA.[17] Plaintiffs' discharges, if the allegations are true, would violate the NLRA.

The majority opinion erroneously asserts that when the term "assist" has been given independent legal force, it has only been in the context of a *nonmember*'s assistance to the labor organization. But its own citation demonstrates that this is not so. The majority cites *Southern Greyhound Lines and Anderson*, which states: "It is well-settled that Section 7 of the Act protects an employee in his right to assist a labor organization *regardless of whether he is eligible for membership in it . . . .*"[18] This quotation implies that both members and nonmembers may assist a union and be protected under § 7. Furthermore, in *United States Dep't of Justice, INS, Border Patrol v Fed Labor Relations Auth*, the court noted that the right to assist any labor organization "confer[s] the right to wear a union lapel pin . . . ."[19] *Border Patrol* did not distinguish

---

[16] See, e.g., *Rider v MacAninch*, 424 F Supp 2d 353, 359 (D RI, 2006) (holding that the defendants in that case, one of whom was a union business agent and one of whom was the union's secretary/treasurer, were "employees" of the union). Indeed, this Court unanimously agrees that plaintiffs were employees of the labor union entitled to the protections of § 7.

[17] *Office Employees Int'l Union, Local 11 v NLRB*, 353 US 313, 316; 77 S Ct 799; 1 L Ed 2d 846 (1957) (holding that, when a union acts as an employer, it is deemed an employer within the meaning of the NLRA and subject to the jurisdiction of the NLRB).

[18] *Southern Greyhound Lines and Anderson*, 169 NLRB 627, 628 (1968).

[19] *United States Dep't of Justice, INS, Border Patrol v Fed Labor Relations Auth*, 955 F2d 998, 1003 (CA 5, 1992).

between members who wear a pin and nonmembers who may choose to do the same, nor would it be sensible to do so.

It is of no legal consequence that plaintiffs have not specifically asserted their right to assist their labor organization under § 7 because reporting suspected criminal activity to the USDOL is per se "assist[ance] [to a] labor organization[]."[20]

Specifically, plaintiffs based their claims of criminal activity on 29 USC 501(a) and (c), which detail the fiduciary responsibilities of officers of labor organizations.[21] 29 USC 501(a) states that "officers . . . of a labor organization occupy positions of trust in relation to such organization and its members as a group" and that each officer therefore has a duty "to account to the organization for any profit received by him in whatever capacity in connection with transactions conducted by him or under his direction on behalf of the organization." Similarly, 29 USC 501(c) prohibits an officer of a labor organization from embezzling, stealing, or converting any "assets of a labor organization of which he is an officer . . . ." To point out when a union officer may not be complying with his or her fiduciary responsibilities is, without question, "assist[ing] a union," irrespective of how plaintiffs characterize their complaints. The NLRA not only protects

_____

[20] 29 USC 157.

[21] See U.S. Department of Labor, Office of Inspector General, Investigative Report, File No 52-803C-0005-LC-J (February 8, 2010), Appellants' Appendix, p 1099a (investigating Local 1191's leaders for a violation of 29 USC 501(c)); Plaintiffs' Answers to Defendants' First Set of Interrogatories, Appellants' Appendix, p 56a (answering a request that plaintiffs "[s]pecifically identify by citation every Federal law, regulation and/or rule upon which Plaintiffs based their 'suspicions of fraud and illegal activity' ").

employees who assist unions in their formation, but also those employees who help unions continue to exist for the benefit of the union members.[22]

Likewise, employees who notice and report corruption of union leadership, particularly when that corruption suggests embezzlement from the union itself or gaining an unfair profit at the union's expense, assist the union by enabling the members to be well represented in a manner consistent with the members' best interests. In this consolidated case, the union officials, in their capacity as employers, were prohibited by the NLRA from discharging their employees simply because the employees reported their suspicions of illegal activity that would harm the union. To permit the employer to do otherwise would "interfere with . . . employees in the exercise of the rights guaranteed in section 7[.]"[23]

The majority, in my view, errs by calling plaintiffs' claims of criminal misconduct "independent assertions" because this implies that those assertions of criminal misconduct had nothing to do with unions or union assistance. It then states that "[w]hile the NLRA regulates employees' concerted activities for their mutual aid or protection, it simply does not regulate the reporting of federal and state crimes." The majority focuses on the wrong activity. The issue is not whether the NLRA regulates the reporting of federal and state crimes. Rather, the issue is whether reporting a federal or state crime in this instance would fall under the protections of the NLRA.[24] Because the purpose of

---

[22] See, e.g., *Eastex, Inc v NLRB*, 437 US 556, 570; 98 S Ct 2505; 57 L Ed 2d 428 (1978).

[23] 29 USC 158(a)(1).

[24] The majority states that the NLRB has no authority to *enforce* the penal aspects of 29 USC 501(c). This is correct, but beside the point. In this case, when plaintiffs filed their

8

reporting the federal and state crimes was to aid or assist the union, the activity falls under § 7 of the NLRA.[25]

Likewise, the majority's focus on *Eastex, Inc v NLRB*[26] is misplaced. The *Eastex* case focuses on the provision in § 7 that states, "Employees shall have the right . . . to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection . . . ." In determining the scope of "other mutual aid or protection, *Eastex* states that "at some point the relationship" between concerted activity and the "employees' interests as employees . . . becomes so attenuated that an activity cannot fairly be deemed to come within the 'mutual aid or protection' clause."[27] Though *Eastex* guides us with regard to the meaning of "mutual aid and protection," it does not aid us in determining what activities "assist" a labor union.

I also conclude that the majority has erroneously applied *Handicabs, Inc and Trail*[28] to the case at hand. True enough, *Handicabs* states that protection under § 7 "can be lost whenever employee communications to third parties do not relate to [the] labor

complaints in the Michigan circuit court, they did not seek enforcement of any criminal statute. All they sought was relief for their wrongful discharge. This claim—wrongful discharge—is the selfsame claim that plaintiffs could have and therefore should have brought before the NLRB.

[25] Certainly, the mere reporting of a suspected crime by one's employer would not fall under the NLRA in all cases. But in this case, the employees did so for the protection of the union and its members, as indicated by plaintiffs' interrogatories, listing violations of a federal duties-of-union-officials statute.

[26] *Eastex*, 437 US 556.

[27] *Id*. at 567-568.

[28] *Handicabs, Inc and Trail*, 318 NLRB 890 (1995).

9

practices of the employer . . . ."[29]   But the majority omits two important details of *Handicabs* that suggest that its rule does not apply in the instant case.  First, *Handicabs* addresses the "mutual aid or protection" aspect of § 7, not its provision related to "assist[ing]" a labor organization.[30]  Second, the portion quoted by the majority truncates language that is not superfluous, but is important to an understanding of the quotation's context; *Handicabs* states that NLRA "protection can be lost whenever employee communications to third parties do not relate to labor practices of the employer, *such as disparaging the employer's reputation or quality of its product, or whenever those communications are maliciously motivated*."[31]  The employee complaints described in *Handicabs* are a far cry from those in the case at hand, in which the employees reported that the union manager was violating his federal, statutorily created fiduciary duties to the union and its members.

---

[29] *Id*. at 896.

[30] The majority argues that communications to third parties do not "assist a labor organization" within the meaning of § 7 unless there is a "relationship between the communication and the employees' interests as employees."  (Emphasis omitted.)  The majority then concludes that speaking out about union leadership's embezzling union funds does not have any connection to the employees' interests as employees.  But existing caselaw calls into question either the majority's premise or its conclusion.  For example, in *American Federation of Government Employees v Fed Labor Relations Auth*, 278 US App DC 358, 363; 878 F2d 460 (1989), the court stated that "an employee's broad 'right to . . . assist' a labor organization" "includes the right to speak out on union-management issues, without fear of reprisal[.]"

[31] *Handicabs*, 318 NLRB at 896 (emphasis added).

## B. THE PREEMPTION EXCEPTIONS

Controversies that would otherwise be preempted by the NLRA are not preempted when a plaintiff's claim reflects "deeply rooted" state interests or are matters of "peripheral concern" to the NLRA.[32] Thus, the issue is whether Michigan has a deeply rooted state interest in applying the WPA in plaintiffs' cases or whether the claims are of peripheral concern to the NLRA.

Though these appear to be two exceptions, in application they amount to one. In practice, courts effectively presume that claims grounded in state law reflect deeply rooted state interests.[33] Thus, the critical inquiry is whether the conduct at issue is of peripheral concern to the NLRA. Generally speaking, courts make this determination by engaging in a fact-intensive inquiry to decide whether the NLRA and the state statute, as applied, prohibit the same activity. When the NLRA and state law do not prohibit the same conduct, the preemption exception will apply.

The United States Supreme Court case *Farmer v United Brotherhood of Carpenters & Joiners*[34] is instrumental in demonstrating how to apply the NLRA preemption exception. In *Farmer*, to determine whether a state-law claim for intentional infliction of emotional distress (IIED) was exempt from NLRA preemption, the Court focused on whether the NLRA's prohibitions protected the plaintiff from the same

---

[32] *Farmer*, 430 US at 296-297 (quotation marks and citation omitted).

[33] See, generally, notes 50-58 of this opinion and accompanying text.

[34] *Farmer*, 430 US 290.

11

complained-of conduct as the state-law IIED claim.[35] The Court contrasted the plaintiff's

IIED claim, which protected the plaintiff from conduct that no reasonable person in

civilized society should be required to endure, with the plaintiff's potential NLRA claim,

which would ask whether the alleged employer conduct rose to the level of an unfair

labor practice under § 8.[36] The Court noted that the two inquiries would be different

because the NLRA did not punish outrageous conduct as outrageous conduct, but merely

insofar as the conduct would have constituted an unfair labor practice.[37] The Court

wrote: "No provision of the National Labor Relations Act protects the 'outrageous

conduct' complained of by petitioner . . . . [T]here is no federal protection for conduct

on the part of union officers which is so outrageous that 'no reasonable man in civilized

society should be expected to endure it.' "[38] Therefore, the Court determined that the

NLRA preemption exception applied to the plaintiff's claim for IIED because "the state-

---

[35] See *id*. at 294 ("[T]he National Labor Relations Board would not have jurisdiction to compensate petitioner for injuries such as emotional distress, pain and suffering, and medical expenses, nor would it have authority to award punitive damages.").

[36] *Id*. at 304 ("[T]he focus of any unfair labor practice proceeding would be on whether the statements or conduct on the part of Union officials discriminated or threatened discrimination . . . . Whether the statements or conduct . . . also caused [the complainant] severe emotional distress and physical injury would play no role in the Board's disposition of the case, and the Board could not award [the complainant] damages for pain, suffering, or medical expenses.").

[37] *Id*.

[38] *Id*. at 302 (citation omitted).

12

court tort action [could] be adjudicated without resolution of the 'merits' of the underlying labor dispute."[39]

The United States Supreme Court clarified this rule in *Sears, Roebuck & Co v San Diego Co Dist Council of Carpenters*, pronouncing that the preemption exception depends upon whether the "controversy presented to the state court is identical to . . . or different from . . . that which could have been, but was not, presented to the Labor Board."[40] The Court's rationale for this rule was that "it is only [when the *controversy* would be identical] that a state court's exercise of jurisdiction necessarily involves a risk of interference with the unfair labor practice jurisdiction of the Board . . . ."[41]

In this case, plaintiffs' claims sound in retaliatory discharge. As discussed previously, I conclude that the alleged retaliatory discharges are not only prohibited by the WPA but also by the NLRA. Plaintiffs reported alleged criminal conduct that triggered protection under the WPA and simultaneously assisted a labor organization, which entitles plaintiffs' activity to NLRA protection. Thus, both the WPA and the NLRA prohibit discharge for the protected action. For this reason, ours is a much weaker case for the preemption exception than any other United States Supreme Court case granting the exception. As noted by the majority, the Court has excepted from the NLRB's exclusive purview causes of action for IIED,[42] threats of violence,[43] trespass,[44]

---

[39] *Id*. at 304.

[40] *Sears, Roebuck & Co v San Diego Co Dist Council of Carpenters*, 436 US 180, 197; 98 S Ct 1745; 56 L Ed 2d 209 (1978).

[41] *Id*.

[42] *Farmer*, 430 US at 302.

malicious interference with a lawful occupation,[45] and malicious libel.[46]  Beyond this, the

Supreme Court, lower federal courts, and other state courts have consistently held that

one type of wrongful-discharge case is not preempted—wrongful discharge for claiming

workers' compensation benefits.[47] But in most other cases that involve union activity,

claims for wrongful discharge are preempted.

The wrongful-discharge cases in which courts have found no NLRA exception

more closely resemble the case at hand than those in which they have found an exception.

Courts have extended preemption to cases alleging wrongful discharge under state

constitutions, state statutes, state common law, and violations of state public policy.  In

some, if not all, of these cases, the state has an interest in regulating the conduct at

issue.[48]  However, the prevailing consideration is not whether the state has an interest in

---

[43] *Youngdahl v Rainfair, Inc*, 355 US 131, 139; 78 S Ct 206; 2 L Ed 2d 151 (1957).

[44] *Sears*, 436 US at 207.

[45] *UAW v Russell*, 356 US 634, 646; 78 S Ct 932; 2 L Ed 2d 1030 (1958).

[46] *Linn v United Plant Guard Workers*, 383 US 53, 62; 86 S Ct 657; 15 L Ed 2d 582 (1966).

[47] See *Lingle v Norge Div of Magic Chef, Inc*, 486 US 399, 108 S Ct 1877; 100 L Ed 2d 410 (1988); *Peabody Galion v Dollar*, 666 F2d 1309 (CA 10, 1982); *Veal v Kerr-McGee Coal Corp*, 682 F Supp 957 (SD Ill, 1988) (holding that three of four claims of wrongful discharge were preempted by the NLRA, excepting only wrongful discharge for exercising rights under workers' compensation law); *Ruiz v Miller Curtain Co, Inc*, 702 SW2d 183 (Tex, 1985).

[48] Indeed, in some of these cases, the state's interests may be considered deeply rooted.

protecting a plaintiff from some employer action, but whether that interest is distinct from the actions the NLRA guards against.[49]

Courts have held that wrongful-discharge claims are preempted by the NLRA despite strong state interests in regulating the conduct. Consider, for example, that at least one federal court and several state courts have held that claims of wrongful discharge in violation of public policy are preempted by the NLRA.[50] In one of these violation-of-public-policy cases, *Lontz v Tharp*, the factual background was similar to this case insofar as plaintiffs in both cases allege facts that demonstrate that they had tried to assist unions.[51] Additionally, one federal court has held that a claim for wrongful discharge based in the common law of contracts was preempted by the NLRA.[52] In that case, *Morris v Chem-Lawn Corp*, the court looked through the plaintiff's breach-of-employment-contract claim and held that it was preempted because the substance of the

---

[49] Cf. *Sears*, 436 US at 197 (asking whether the "controversy presented to the state court is identical to . . . or different from . . . that which could have been, but was not, presented to the Labor Board"); *Farmer*, 430 US at 294 (deciding that "the National Labor Relations Board would not have jurisdiction to compensate petitioner for injuries such as emotional distress, pain and suffering, and medical expenses, nor would it have authority to award punitive damages").

[50] See *Hussaini v Gelita USA, Inc*, 749 F Supp 2d 909 (ND Iowa, 2010); *Robbins v Harbour Indus, Inc*, 150 Vt 604; 556 A2d 55 (1988); *Lontz v Tharp*, 220 W Va 282; 647 SE2d 718 (2007).

[51] See, e.g., *Lontz*, 647 SE2d at 722 (holding as preempted an employee's claim that she was wrongfully discharged for refusing to have a union organizer arrested, in violation of public policy).

[52] See *Morris v Chem-Lawn Corp*, 541 F Supp 479 (ED Mich, 1982).

15

claim was that she had been discharged for supporting a union.[53]  In another case similar to this one, a state appeals court held that the NLRA preempted a state statutory claim for wrongful discharge.[54]  That case, *Kilb v First Student Transp, LLC*, is akin to our case both because it presents a conflict between the NLRA and a state statutory claim and because it is a case in which the plaintiff was discharged for attempting to assist a union.[55]  Finally, at least one federal court has held as preempted a claim for wrongful discharge in violation of the most deeply rooted state interest of all, a state constitutional right.[56]  In that case, *Veal v Kerr-McGee Coal Corp*, the court went out of its way to explain that NLRA preemption did not depend on how strong the state's interest was in protecting its citizens.[57]  Rather, the cases governing the NLRA preemption exception base their holdings on whether the state constitution and the NLRA governed the same conduct. Because the two laws attempted to govern the same employer conduct, the claim was preempted because permitting any tribunal but the NLRB to adjudicate the claim presented a great risk that the state constitutional right would conflict with the "federal regulatory scheme."[58]

---

[53] *Id*. at 483.

[54] See *Kilb v First Student Transp, LLC*, 157 Wash App 280; 236 P3d 968 (2010).

[55] *Id*. at 283-284 (holding as preempted the plaintiff's claim that he was wrongfully discharged for refusing to discharge pro-union employees and refusing to engage in the employer's anti-union efforts, in violation of state law).

[56] *Veal*, 682 F Supp at 957.

[57] *Id*. at 960-961.

[58] *Id*. at 960 ("While it cannot be seriously argued that the interest of the State of Illinois in protecting its workers from wrongful discharge for exercising their state constitutional

This case bears a greater resemblance to the aforementioned no-exception cases than to the cases that find a preemption exception. In this case, plaintiffs were employees of a union who noticed that certain union officials were incorrectly reporting the union members' activities for the purpose of paying them out of the strike fund when the members had actually been making repairs on a building. Alarmed, plaintiffs reported to the USDOL, on the union members' behalf, that a union official might have embezzled union funds or otherwise violated his statutory duty not to profit from his position as a union official.[59] This was an attempt to assist the union members; the fact that the claims were criminal in nature is immaterial. The unfair labor practice in this case is *not* the alleged criminal actions—embezzlement or breach of fiduciary duty. Plaintiffs never alleged a cause of action for embezzlement or breach of fiduciary duty in the circuit court; therefore, the employer's alleged criminal conduct does not constitute the unfair labor practice. The unfair labor practice here is the wrongful discharge of these employees. In this case, the claim for wrongful discharge under the WPA essentially prohibits the same employer conduct as a claim of unfair labor practices under § 8 of the NLRA. An employer may not discharge an employee for attempting to assist a labor organization. Thus, because the conduct of the employer would be prohibited by the NLRA in the same way that it would be prohibited under Michigan law, Michigan has no

right to association deserves little weight, it is manifest that this Court's judicial recognition of that interest poses a serious threat of interference with the federal regulatory scheme embodied by Congress' creation of the NLRB . . . .").

[59] See Plaintiffs' Answers to Defendants' First Set of Interrogatories, Appellants' Appendix, p 56a.

deeply rooted interest in hearing plaintiffs' WPA claims, which allege the very same unlawful conduct as an unfair-labor-practice claim under the NLRA.[60] And because the employer's discharge of plaintiffs for protected activities is a preeminent rather than a peripheral concern of the NLRA, any claims arising from the wrongful discharge must "be left in the first instance to the National Labor Relations Board."[61]

Though the majority is correct that Michigan's WPA statute protects important state interests that are often different than the NLRA's main concerns, this is not the question that we must answer. This case is not about whether the WPA protects an *area of law* that is of peripheral concern to the NLRA; indeed, if it did not, it would be completely preempted by the NLRA. Instead, the issue is whether the *controversy* is of peripheral concern to the NLRA. Because a discharge for assisting a labor union would be an unfair labor practice under the NLRA, Michigan has no deeply rooted state interest in deciding that controversy for its citizens, and the NLRA will provide the relevant relief.

### III. ANTICIRCUMVENTION AND NLRA PREEMPTION

Plaintiffs' WPA claims represent a classic example of unacceptable NLRB circumvention by artful pleading. Courts adjudicating NLRA preemption are rightfully

---

[60] Compare *Farmer*, 430 US at 304, which held that the plaintiff's IIED claim was not preempted because the state court would not have to reach the "merits of the underlying labor dispute." (Quotation marks omitted.) In this case, the WPA wrongful-discharge claim jeopardizes the NLRB's exclusive jurisdiction over labor disputes because of the risk that the WPA would adjudicate the same, federally protected and prohibited conduct differently.

[61] *Garmon*, 359 US at 244-245.

18

concerned about circumvention, which would undermine the NLRB's exclusive jurisdiction over labor disputes. One example of circumvention through artful pleading that courts have struck down is the identical-elements test, under which plaintiffs incorrectly allege that, because the elements of their state-law claim and the elements of unfair labor practices under the NLRA are not identical, their state-law claim should not be preempted. Courts reject the identical-elements test because it undermines the NLRB's exclusive jurisdiction. For example, in *Hussaini v Gelita USA, Inc*, the United States District Court for the Northern District of Iowa stated that there was no identical-elements test because an "NLRB proceeding and a state-law cause of action will, by definition, deal with different claims and if this lack of identity were conclusive, state claims would never be preempted."[62] Likewise, the court in *Robbins v Harbour Indus, Inc* eschewed formalism in holding that "[t]he characterization of the claim under state law has little, if any, bearing on the outcome of the preemption issue. Rather, cases applying the exception for conduct which is only of peripheral concern to the NLRA almost always involve an analysis of the facts underlying the state action" to determine whether the "controversy presented to the state court is identical to . . . or different from" the controversy that could have been presented to the NLRB.[63] It does not matter what terms a plaintiff's state claim is couched in when the "basis of [the plaintiff's] claim, as revealed [by discovery], is that [the] employer discharged [the employee] because of [the

---

[62] *Hussaini*, 749 F Supp 2d at 921.

[63] *Robbins*, 556 A2d at 57, quoting *Sears*, 436 US at 197 (quotation marks omitted).

employee's] support of" a union[64]—whether that be aid in its formative stages or assistance sometime down the road.

The majority's ruling enables plaintiffs to circumvent the exclusive jurisdiction of the NLRB simply because they alleged criminal conduct to the USDOL. In doing so, the majority overlooks the fact that plaintiffs alleged that the criminal conduct violated a federal labor statute, 29 USC 501(a) and (c), which leads to the key conclusion that plaintiffs took the steps that they did to assist the members of the labor union. Labor union members are in need of this type of assistance because any right to bargain for the members' collective good might be undermined by corrupt union leadership that embezzles union funds or prioritizes its own profit over the interests of the members. Because the NLRA preempts plaintiffs' WPA claims in full, I dissent.

Brian K. Zahra

---

[64] *Morris*, 541 F Supp at 482.